Filed 9/19/13  P. v. Martinez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038034 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1103101) |
| v. | |
| JULIAN JOSE MARTINEZ, | |
| Defendant and Appellant. | |

Defendant Julian Jose Martinez was convicted after a jury trial of four counts of aggravated sexual assault by oral copulation of a child under the age of 14 years of age (Pen. Code, § 269, subd. (a)(4)).  The court in a bench trial later found true (1) the allegation that defendant had previously been convicted of a violent or serious felony, or strike offense, and (2) the allegation that each of the charged offenses constituted serious felonies.  In February 2012, defendant was sentenced to 120 years to life in prison, consecutive to 20 years.

Defendant claims on appeal that the court erred in admitting irrelevant and prejudicial evidence:  namely, that the victim suffered from seizures about four years after the last alleged assault and, for that reason, he moved out of the area a few months before trial.  He contends that this evidence was used improperly by the prosecution to

garner sympathy for the victim. He argues further that, even if the evidence had any relevance, it should have been excluded under Evidence Code section 352[1] because its probative value was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. As to the second argument, defendant asserts that if his trial counsel failed to object to the evidence in court under section 352, his failure to do so constituted prejudicially ineffective assistance of counsel.

We conclude that the court did not abuse its discretion by admitting the challenged evidence over defendant's relevance objection. We hold further that even though trial counsel failed to preserve an objection to the evidence under section 352, such failure did not constitute ineffective assistance of counsel warranting the relief sought by defendant. Accordingly, we will affirm the judgment.

FACTS

I.    *Background*

Defendant was born in April 1978 and was therefore 33 years old at the time of trial. C.D. (Mother) is his mother. Mother is the adoptive mother of J.D., who was born in September 1995 and was 16 years old at the time of trial. Mother's niece, Y.S., is J.D.'s biological mother.

J.D. testified that he originally lived with his family in Milpitas, before moving to south San José. He lived there with his family in around 2005 to 2006 in San José (the first San José home). Defendant also lived with them and had his own room there. His family moved to another home in San José, where they lived between 2006 until 2011 (the second San José home). J.D. testified that defendant lived with them at the second San José home for a short time.

---

[1] Further statutory references are to the Evidence Code unless otherwise stated.

According to Mother, defendant lived "off and on" in her household between 2004 and 2009. When she lived with her family at the first San José home, defendant did not have his own bedroom, but did visit on occasion—possibly twice a week—and sometimes stayed there. Defendant would sometimes babysit for her.

Mother further testified that beginning in approximately 2004, she noticed a change in J.D. He became "[v]ery closed," antisocial, didn't like to play very much, and didn't trust anyone. Before that time, J.D. had been "a happy little boy. He loved school. He just loved to play." He also had a bedwetting problem that developed around 2004 and continued to 2009.

In April 2010, Mother was told by J.D.'s sister, A., that defendant had been abusing J.D. Around the same time, Mother contacted the police.

II.     *Videotaped Interview*

J.D. gave a videotaped interview to Detective Justin Palmer of the San José Police Department on July 26, 2010. J.D. testified at trial more than a year later that he had truthfully related to the detective what had happened to him, but that his memory of the events was better during the prior interview than it was at trial. On several occasions during his testimony, he was shown a report of the interview prepared by the detective, and also viewed the entire videotaped interview. The videotaped interview itself was introduced into evidence and played to the jury.

III.    *Charged Offenses*[2]

J.D. testified that defendant forced him to orally copulate him on more than 10 occasions.[3] The incidents occurred in San José in both the first San José home (2005-

---

[2] Because there were no corroborating witnesses to the incidents underlying the crimes charged in the information, the evidence recited in this section, except for the last paragraph, is derived solely from the testimony of the victim, J.D.

[3] J.D. admitted during cross-examination that he recalled telling a detective that the incidents happened almost every day for three years, and then later told him that they

*(continued)*

3

2006) and later in the second San José home (2006-2007). It happened on multiple occasions in both homes. The incidents occurred when J.D.'s Mother was away from home. No one ever witnessed the incidents; they were "always behind closed doors." At trial, J.D. could not remember the details, including the dates, of most of the incidents. He testified that he did not like coming to court to testify "at all," because he was trying to put the incidents behind him, and because they were "embarrassing [and d]isgusting." He found it hard to look at defendant in the courtroom because of "[d]isgust, I guess."

J.D. performed oral sex on defendant because he "felt threatened." On many of the occasions, defendant threatened to hit J.D. if he did not comply. He also "thrust [J.D.'s] head toward his penis" on more than one occasion. Many times also, defendant instructed J.D. not to tell anyone "or else [he] w[ould] get [J.D.]."[4] J.D. told defendant "[e]very time" that he did not want to do what he asked. When J.D. would try to walk away, defendant would pull him back by his shirt or his arm. Each incident concluded with defendant ejaculating either onto a tissue or a towel. J.D. brushed his teeth after each incident. He did so because he felt his "mouth was dirty."

J.D. initially testified that he did not remember when it was that he was first forced to perform oral sex on defendant because "[i]t's been a long time ago" and he doesn't like to think about it. He recalled that he was in the fifth grade and was approximately 10 when it first occurred. After he was shown a report of the interview to refresh his recollection, J.D. remembered the first incident slightly better. It occurred in the first San José home when he was 11, during the summer before he went into the fifth grade. He was downstairs watching television with his brother when defendant called him to a room upstairs. Defendant locked the door, unzipped his pants, and told J.D. that if he didn't

occurred every other day. Immediately after saying this to the detective, J.D. said that he was forced to orally copulate defendant "40 to 50 [times in total], I guess."

[4] In the interview with Detective Palmer, J.D. said that "[m]any times," defendant told him, " 'If you tell anyone, I'll hit you.' "

4

"[s]uck his penis," defendant would hit him. Although he didn't want to, J.D. complied; he was afraid. After a few minutes, defendant ejaculated into a tissue. Defendant then walked out of the room "as if nothing [had] happened."

At another time while J.D. was living in the first San José home, he was downstairs watching television. Defendant "came down, pulled down his pants and took out his penis like usual, and then he had a towel on his shoulder, and he told [J.D.] that if [he] didn't do it, that he would hit [J.D.], and so [J.D.] did it." Defendant ejaculated into the towel and then went upstairs to take a shower.[5]

On one occasion at the second San José home, defendant called J.D. into Mother's bedroom where there was "a big mirror."[6] Defendant, who "had his pants down already," pulled J.D. into the room and directed J.D. to orally copulate him. J.D. tried to leave, but defendant told him he "would give [him] stuff . . .[and] then he told [J.D.] if [he] didn't, [he'd] be in trouble." J.D. was scared because defendant was "[m]uch bigger" than he.[7] J.D. understood defendant's saying that J.D. would "be in trouble . . . as a threat, I guess." While J.D. was performing oral sex, defendant had his hand on J.D.'s head. It lasted "[a] few minutes" until defendant ejaculated into a tissue.

At another time at the second San José home, after J.D. was trying to refuse defendant's demand that he perform oral sex on him, defendant threatened to hit J.D. He believed defendant when he threatened him. J.D. said he did not "really remember [the incident] clearly."

---

[5] This incident was related by J.D. to Detective Palmer in the videotaped interview that was played in court. J.D. told the detective that defendant "pulled me by my arms, 'cause I was sittin' on the floor, and then [defendant] pulled me against [his penis]."

[6] J.D. testified initially that the incident occurred in his Mother's bathroom. When he was asked later on direct examination whether it was the bathroom or bedroom, he testified it was his Mother's bedroom.

[7] As of 2007, defendant was 29 years old, was six feet, two inches tall, and weighed 255 pounds.

J.D. recalled that the last incident occurred between 2007 and 2008 in his bedroom at the second San José home when J.D. was in the seventh grade. J.D. was watching television in the living room, and defendant called him into J.D.'s bedroom. J.D. tried to walk out of the room so that he would not have to orally copulate defendant. But defendant grabbed J.D. by the shirt and pulled him back into the bedroom. Defendant locked the door, and then "made [J.D.] suck [his] penis" until he ejaculated into a tissue.

J.D. told his older brother and his two sisters, V. and A., about what had happened to him. He gave no specifics to them. He also told his adoptive father, V.D. (Father), on one occasion: " 'You don't know what happened to me.' "[8]

II.     *Uncharged Offenses*

A., Y.S.'s eldest daughter and J.D.'s sister, testified that when she was about five or six years old, defendant touched her inappropriately by rubbing his penis against her vagina. On April 11, 1994, the court (Santa Clara County Superior Court case number JV100352) sustained a juvenile petition alleging that defendant, then 15 years old, committed an act involving A., then six, which had it been committed by an adult, would have constituted annoying or molesting a child under the age of 18 (Pen. Code, § 647.6).[9]

Additionally, defendant was convicted in 2007 (Santa Clara County Superior Court case number FF720217) of three counts of committing lewd or lascivious acts upon

---

[8] In response to Detective Palmer's question during the July 2010 interview as to whether he was afraid to tell anyone about the incidents, J.D. replied: "Like, I didn't want people to be like, 'Oh wow, why didn't you say anything[']or[']why would you go along with it?' But I mean, it's not easy just to back away. Or like they wouldn't believe me."

[9] The defense called Mary Ritter, physician's assistant and primary examiner at the Child Sexual Abuse Clinic in the Center for Child Protection at Santa Clara Valley Medical Center. Ritter testified that she examined A., and found no evidence of penetrating trauma. Ritter testified that the absence of such findings does not mean that no sexual assault occurred. She noted that in the majority of the alleged child sexual abuse cases, there is late disclosure and that in most cases, the examination yields no sign of penetrating trauma.

a child 14 or 15 years old (Pen. Code, § 288, subd. (c)(1)).  The victim, P., called by the defense, testified that she was 15 when she knew defendant (who was then 29).  She has a tattoo on her neck with the word "Julian," and she had sex with him several times back in 2007.  Defendant made a video recording in April 2007 of a sexual act between her and defendant.

Detective Palmer testified that during an interview conducted on February 10, 2011, defendant, after he had been given *Miranda* warnings,[10] told the detective "that he had taken a deal on his prior case because he knew he had committed the acts."[11]  He also told Detective Palmer that he was bisexual.

### III.    *Expert Testimony*

Carl Lewis, a retired law enforcement officer, testified as an expert on the subject of child interviews and Child Sexual Assault Accommodation Syndrome (CSAAS).  He testified that child victims of sexual assault are almost always reluctant to disclose sexual abuse.[12]  The victim feels a sense of shame, embarrassment, and even guilt.  There is often fear associated with disclosure, with the child thinking about negative outcomes from coming forward.  "Helplessness is almost a built-in aspect of child sexual abuse."

---

[10] *Miranda v. Arizona* (1966) 384 U.S. 436.

[11] Although the reference to "[defendant's] prior case" is not clear from Detective Palmer's testimony, we infer that it was the 2007 case in which defendant entered a guilty or no contest plea to three counts of violating Penal Code section 288, subdivision (c)(1), since it was the only prior criminal case mentioned to the jury.

[12] Lewis testified that the "seminal" peer review article on CSAAS was published in 1983 by Dr. Roland Summit.  "Dr. Summit chose the term 'syndrome' to describe the collection of . . . five things that tend to occur at about the same time or in a sequence as related to child sexual abuse."  Lewis testified that these five elements, as identified by Dr. Summit, are secrecy; helplessness; entrapment and accommodation; delayed, conflicted and unconvincing disclosure; and retraction.  As explained by one court: "Although inadmissible to prove that a molestation occurred, CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.)

7

The difficulty is particularly acute when the abuser is someone close to the child, resulting in a fear of the consequences of disclosing the abuse. The typical reasons given by a child for not reporting child abuse sooner are a fear of getting in trouble and a belief that no one would believe him or her.

Based upon his experience, Lewis testified that there is almost always delayed reporting of child sexual abuse. Delay is the norm, he testified, based upon both his experience as well as from what he has read in the professional literature.

Lewis also noted that a child victim has difficulty in describing the details of what physically occurred to him or her, due to embarrassment and a reduced understanding about sexual activity. Child victims, in Lewis's experience, are often not readily able to remember specific incidents or relate the details of them, such as the specific acts, times and dates. Lewis explained: "Children typically don't attach time and date significance like adults do to occurrences, particularly if those sexually abusive events followed a similar pattern, if there were a number of similar type[s] of incidents." "[C]hildren disclosing sexual abuse that occurs over a period of time describe incidents in kind of a conglomerate way. That is, many of them tend to run together."

PROCEDURAL BACKGROUND

Defendant was charged by felony complaint filed March 17, 2011, deemed by stipulation of counsel to be an information, with four counts of aggravated sexual assault by oral copulation of a child under 14 and 7 or more years younger than defendant (Pen. Code, § 269, subd. (a)(4); counts 1 through 4), and four counts of forcible lewd or lascivious acts upon a child (Pen. Code, § 288, subd. (b)(1); counts 5 through 8). It was also alleged as enhancements that defendant had suffered a prior violent or serious felony, i.e., a strike (Pen. Code, §§ 667, subds. (b)–(i); 1170.12)—namely, robbery (Pen. Code, § 211); and that prior to the commission of the charged offenses that constitute serious felonies, defendant had been convicted of a serious felony (Pen. Code, § 667, subd. (a)).

8

Prior to the empanelment of the jury, the court, pursuant to the People request, dismissed counts 5 through 8.  After the evidentiary portion of the trial had concluded, the court granted the People's motion to amend the information to allege that the charged offenses had been committed between September 3, 2005, and April 8, 2007.  The People thereafter filed an amended information conforming to the prior oral amendment.

On September 26, 2011, a jury convicted defendant of all four counts alleged in the amended information.  In November 2011, after a bench trial, the court found true the strike allegation and the allegation that prior to the commission of the charged offenses that constitute serious felonies, defendant had been convicted of a serious felony.

On February 14, 2012, the court sentenced defendant to consecutive sentences of 30 years to life in prison for each of the four counts, along with four consecutive terms of five years each for the sustained prior serious felony allegations attaching to each count of which defendant was convicted.  The total sentence was 120 years to life in prison, consecutive to 20 years.  Defendant filed a timely notice of appeal.

DISCUSSION

I.        *Claim of Error in Admission of Evidence Concerning Victim*

        A.        *Background and Contentions*

Mother during direct examination testified that the family had moved to San Diego because J.D. was having seizures.  Defense counsel objected to this testimony, contending it was irrelevant; the court overruled the objection.  The prosecution then asked Mother to explain what she meant about J.D.'s seizures.  Mother testified:  "He would have sei[z]ures where he would fall on the floor, pass out.  We would have to take him to the hospital.  He had a lot of tests done.  Seeing your son on the floor not being able to get up, not being able to be in school.  Just couldn't cope with that, seeing him on the floor because the medication, how it had an [e]ffect on him.  Everyday rushing him to the hospital.  Tests had to be done."  Defense counsel then interposed a relevance objection that the court overruled.

9

J.D. testified that the family had moved to San Diego in 2011, possibly "[a] few months" before trial. When he was initially asked why the family moved, he responded (without objection by defense counsel) that there was "[t]oo much stress here" and "just way too much drama with . . . everything with my family here." He later explained that part of what was "going on" with his family was that, although he was "fine now, a few months ago[, he] was going through seizures almost every day."

Father testified that he had brought J.D. from San Diego to testify at trial, and that they had moved south to San Diego about two months earlier. Father was asked why the family had moved to San Diego. Without objection, he testified that J.D. "was getting bad. So we decided to take him . . . there for him to not be too stressed out." He explained that J.D. had been having seizures once or twice a week.

On appeal, defendant argues that evidence that J.D. had experienced seizures and that the family had to move to San Diego was irrelevant and the court should have sustained defense counsel's relevancy objections. He contends that there was no evidence that linked J.D.'s seizures with the prior molestation incidents about which he testified. Furthermore, he argues, there was an approximate four-year gap between the date of the last alleged incident and the onset of the seizures. He argues: "The jury could only guess that [J.D.'s] seizures might have arisen from posttraumatic stress occasioned by the molestation." Further, any attempt to explain the move to San Diego as having been motivated by J.D.'s seizures was unjustified, since both the move and the seizures were irrelevant. The evidence, he contends, was improper because it constituted "victim sympathy evidence."

Defendant makes the alternative argument that, assuming arguendo the challenged evidence was relevant, its "probative value . . . was overwhelmingly outweighed by its prejudicial effect within the meaning of Evidence Code section 352." He argues that trial counsel's objection was sufficient to preserve the issue, but even were we to find it

insufficient, the failure to object on that basis constituted prejudicially ineffective assistance of counsel.

We address defendant's arguments below.

### B. *Evidence Was Relevant; Court Did Not Abuse its Discretion*

#### 1. *Applicable Law*

Only evidence that is relevant is admissible. (§ 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 749.) "Accordingly, a 'witness may not be examined on matters that are irrelevant to the issue in the case.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 640.)

"The trial court has broad discretion in determining the relevance of evidence. [Citation.] We review for abuse of discretion a trial court's rulings on the admissibility of evidence. [Citations.]" (*People v. Harris* (2005) 37 Cal.4th 310, 337.) In reviewing defendant's claim that the trial court erred because the evidence of J.D.'s seizures and move to San Diego was irrelevant and inadmissible, we are cognizant of this broad discretion and "apply the deferential abuse of discretion standard." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1123; see also *People v. Benavides* (2005) 35 Cal.4th 69, 90.) Although the court " 'has broad discretion in determining the relevance of evidence [citations] . . . , [it] lacks discretion to admit irrelevant evidence.' [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 289.)

#### 2. *Relevance Objection Was Properly Overruled*

In response to defendant's claim that the evidence of J.D.'s seizures and move to San Diego had no relevance, the Attorney General contends that it "was relevant to explain his demeanor at trial, including his reluctance to testify and inability to recall details of the molestation."

11

"A witness's demeanor is 'part of the evidence' and is 'of considerable legal consequence.' [Citations.]" (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358; see also § 780, subd. (a); Judicial Council of Cal.Crim. Jury Instns. (2013) CALCRIM Nos. 105, 226 [instructions concerning factors jury should consider in evaluating witness's credibility, including "behavior while testifying"].) Thus, for example, " '[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court. [Citations.]' [Citations.]" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946, quoting *People v. Burgener* (2003) 29 Cal.4th 833, 869; see also *People v. Feagin* (1995) 34 Cal.App.4th 1427, 1433.) Likewise, expert testimony concerning the behavior of victims of domestic violence may be permissible insofar as it may relate to the credibility of the testifying victim. (*People v. Brown* (2004) 33 Cal.4th 892, 906-907; see also *People v. Patino*, *supra*, 26 Cal.App.4th at p. 1744 [expert testimony concerning CSAAS admissible on issue of victim's credibility by potentially refuting jury's preconceptions as to how child in general may react to molestation].)

The evidence proffered concerning the witness's demeanor may consist of outside factors or medical issues having no direct bearing on the issues at trial themselves. Thus, for instance, in *People v. Scott* (2011) 52 Cal.4th 452, 493, the prosecution—over defense counsel's relevance objection and contention that the evidence would elicit sympathy toward the witness—was permitted to ask questions establishing that one of the rape victims testifying at trial had just given birth and had been discharged from the hospital the night before appearing in court. The trial court advised the jury that this evidence had been presented " 'so that you would be aware of [the witness's] present physical and emotional condition as it may bear on her ability to testify' " and instructed the jury not to consider it for either sympathy or bias. (*Ibid.*) Our high court rejected the defendant's

12

claim of error, finding that the trial court had properly considered the evidence admissible on the issue of the witness's demeanor as it related to her credibility.  (*Ibid.*)

Here, as was the case with the victim in *People v. Scott*, *supra*, 52 Cal.4th 452, evidence that J.D. had experienced a bout of seizures and had moved out of the San José area within months of his appearance at trial was relevant to his demeanor and credibility as a witness.  That evidence, coupled with J.D.'s testimony that he found it very difficult to come to court and to face defendant, provided the jury with a plausible explanation (if it chose to accept it) of why he had difficulty remembering details of the multiple incidents of molestation to which he testified and any inconsistencies between his testimony and his prior interview with the police.

Defendant cites *People v. Vance* (2010) 188 Cal.App.4th 1182, in support of his claim of error, arguing that the purpose and effect of the challenged evidence was to engender sympathy toward J.D.  In that case, the prosecutor argued to the jury that in its deliberations, it needed to " 'walk in [the murder victim's] shoes.  You have to literally relive in your mind's eye and in your feelings what [the victim] experienced the night he was murdered.  . . . You have to do that in order to get a sense of what he went through.' "  (*Id.* at p. 1194.)  After an initial objection to this argument was sustained by the trial court, the prosecutor, over several more sustained objections, continued to give improper argument asking the jury to imagine the suffering of the victim.  (*Id.* at pp. 1194-1196.)  The trial court denied defense counsel's motion for a mistrial.  It also denied posttrial motions for a new trial and to reduce the conviction from first degree to second degree murder.  (*Id.* at pp. 1196-1197.)  The appellate court reversed, finding, inter alia, that the prosecutor's argument was " 'The Golden Rule' " argument that is "universally condemned across the nation . . . [in which] a prosecutor invites the jury to put itself in the victim's position and imagine what the victim experienced.  This is misconduct, because it is a blatant appeal to the jury's natural sympathy for the victim.  [Citation.]"  (*Id.* at p. 1188.)  Because of the repetitive and severe nature of the comments

13

constituting prosecutorial misconduct,[13] the trial court's failure to provide a curative admonition, and its conclusion that the error was prejudicial, the court reversed the judgment. (*Id.* at pp. 1202-1207.)

The facts of *People v. Vance* bear no resemblance to those here. There was no improper jury argument complained of—no invocation of "The Golden Rule" in which the jury was asked to put itself in J.D.'s shoes and to imagine the suffering he endured from the molestation incidents. At most, there were brief references in the testimony of three witnesses that J.D. had suffered from seizures (a condition that had apparently subsided and which the prosecution did not mention in argument) and had moved to San Diego shortly before trial. Furthermore, the claimed error here concerns the introduction of evidence to which defense counsel objected on the basis that it was irrelevant, yet the court exercised its discretion to admit the evidence. In *Vance*, the prosecutor did not introduce evidence of the victim's suffering. Instead, it presented lengthy, improper argument on the subject that the appellate court held was a "blatant" invocation of "The Golden Rule." (*People v. Vance*, *supra*, 188 Cal.App.4th at p. 1199.)

In short, the challenged evidence concerning J.D.'s seizures and move to San Diego was relevant and the court did not abuse its discretion in admitting the evidence over defendant's objection.

### C. *Section 352 Objection Is Unmeritorious*

#### 1 *Applicable Law*

Under section 352, courts should exclude evidence where "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the

---

[13] The appellate court indicated that, pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), a copy of the opinion would be forwarded to the State Bar for potential disciplinary action. (*People v. Vance*, *supra*, 188 Cal.App.4th at p. 1214.)

14

issues, or of misleading the jury." (§ 352.)  As the court stated in *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369, "[W]hile admissible evidence often carries with it a certain amount of prejudice, Evidence Code section 352 is designed for situations in which evidence of little evidentiary impact evokes an emotional bias.  [Citation.]"

As is the case with rulings on the relevance of evidence, we apply an abuse of discretion standard to the trial court's exercise of discretion under section 352; the court's decision will not be reversed absent a showing that such discretion was exercised in an " 'arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]'  [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125; see also *People v. Ochoa* (2001) 26 Cal.4th 398, 437-438, abrogated on another point as stated in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14.)

## 2.     *The Claim Is Forfeited*

Section 353 prohibits the reversal of a judgment based upon the erroneous admission of evidence, unless two requirements are satisfied.  First, the record must show "an objection to or a motion to exclude or to strike the evidence was timely made and so stated as to make clear the specific ground of the objection or motion." (§ 353, subd. (a).)  Second, the appellate court must conclude that "the admitted evidence should have been excluded on the ground stated" and that such admission "resulted in a miscarriage of justice." (§ 353, subd. (b).)

The California Supreme Court has " ' "consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." ' [Citation.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20-21.)  "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' [Citation.]" (*People v. Partida* (2005) 37 Cal.4th 428, 434.)

15

The specific ground for the evidentiary objection must be enunciated at trial in order to preserve it on appeal, and an objection at trial on *another ground* will not preserve the right to appeal on a different basis. (*People v. Partida*, *supra*, 37 Cal.4th at p. 435.) "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Ibid.*) Thus, for instance, a defendant's objection at trial to testimony on the grounds that it was not relevant, lacked foundation, was speculative, and nonresponsive did not preserve an objection that it constituted character evidence inadmissible under section 1101, subdivision (a). (*People v. Demetrulias*, *supra*, 39 Cal.4th at pp. 20-21.) And where the defendant failed to object under section 352 to evidence of his attempt to murder a person to whom he had admitted having committed two murders, his appellate claim that the probative value of the evidence was substantially outweighed by its undue consumption of time and probability of substantial prejudice was forfeited. (*People v. Harrison* (2005) 35 Cal.4th 208, 230-231; see also *Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 749 [objection on relevance grounds to question concerning whether company had terminated employment of the plaintiff's predecessor did not preserve unasserted objection that evidence should have been excluded under section 352].)

Here, each of defense counsel's three objections to the evidence of J.D.'s seizures and recent move to San Diego—made during the direct examination of Mother—was based on the assertion that the evidence was not relevant. There was no objection, either by citation to the statute or by referring to its substance, that the probative value of that evidence was substantially outweighed by the probability that its admission would be unduly time-consuming or would create a substantial danger of undue prejudice, confusion of issues, or misleading the jury, such that the evidence should be excluded under section 352. Contrary to defendant's assertion, defense counsel's third objection— "Your Honor, I'm sympathetic but I don't understand the relevance"—was insufficient to preserve an objection under section 352. Counsel's objection did not identify section 352

16

as the basis for the objection, nor did he state any of its substance to advise the court that he objected to the evidence on that basis.

The evidentiary " 'objection [must] fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' " (*People v. Abel* (2012) 53 Cal.4th 891, 924, quoting *People v. Partida*, *supra*, 37 Cal.4th at p. 435.) Defendant did not fairly inform the court below that it objected to admission of the evidence under section 352; accordingly, he has forfeited the challenge here. (*People v. Harrison*, *supra*, 35 Cal.4th at pp. 230-231.)

### 3.     *Ineffective Assistance Claim Is Without Merit*

Defendant argues in the alternative that, even if trial counsel failed to preserve the objection under section 352, such failure constituted prejudicially ineffective assistance of counsel. This alternative claim has no merit.

An ineffective assistance of counsel claim requires a showing that "counsel's action was, objectively considered, both deficient under prevailing professional norms and prejudicial." (*People v. Seaton* (2001) 26 Cal.4th 598, 666, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "[T]he burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Lewis* (1990) 50 Cal.3d 262, 288; see also *People v. Weaver* (2001) 26 Cal.4th 876, 961.) This means that the defendant "must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to [the] defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.] "

17

(*People v. Kipp* (1998) 18 Cal.4th 349, 366, quoting *Strickland*, *supra*, 466 U.S. at p. 686.)

As to the first element (deficient performance), an appellate "court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 207; see also *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Defendant's ineffective assistance claim fails because he cannot establish deficient performance. The record here does not disclose why defense counsel failed to assert an objection under section 352. Counsel to our knowledge was not asked to explain this omission, and this is not an instance in which there could be no satisfactory explanation. (*People v. Gray*, *supra*, 37 Cal.4th at p. 207.) As we have discussed (see pt. I.B.2., *ante*), the challenged evidence concerning J.D.'s seizures and move to San Diego was, contrary to defendant's assertion, relevant to the issue of his demeanor and credibility. Because that evidence was not extensive, a section 352 objection on the ground of undue consumption of time would have been without merit.

Additionally, while the evidence may have been prejudicial to some extent in that it could have engendered sympathy for the victim, this is not an instance in which, on its face, "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . ." (§ 352.) "[E]vidence is substantially more prejudicial than probative within the meaning of Evidence Code section 352 if ' "it poses an intolerable 'risk to the fairness of the proceedings or the

18

reliability of the outcome' [citation]." [Citation.] "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." [Citation.]' [Citation.]" (*People v. Paniagua* (2012) 209 Cal.App.4th 499, 517.) Based upon these substantial hurdles to a successful challenge, trial counsel, in deciding not to lodge a section 352 objection, may have taken into consideration the likelihood that such an objection would have been overruled.[14]

Further, defense counsel may have chosen not to make the objection because doing so, after the court's having previously overruled his multiple relevancy objections, would have unduly emphasized the evidence in the eyes of the jury. (Cf. *People v. Freeman* (1994) 8 Cal.4th 450, 495 [failure to request limiting instruction on prior crimes evidence not ineffective assistance because trial counsel " 'may well not have desired the court to emphasize the evidence' "].) In evaluating ineffective assistance claims, we " 'will not second-guess trial counsel's reasonable tactical decisions.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1185; see also *People v. Price* (1991) 1 Cal.4th 324, 387 [failure to make futile or unmeritorious objection is not deficient performance].) Defendant therefore cannot establish deficient performance, the first element of an ineffective assistance claim. (See *People v. Riel*, *supra*, 22 Cal.4th at p. 1185 [" 'failure to object seldom establishes counsel's incompetence' "].)

Even were we to assume that defense counsel's performance was deficient because of his failure to object under section 352, defendant cannot show he was prejudiced. To do so, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) However, prejudice must be established as " 'a

---

**14** Defendant's trial counsel undoubtedly was aware of the availability of a section 352 objection, having asserted it on other occasions during the trial relative to other evidence.

"demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.' " (*In re Clark* (1993) 5 Cal.4th 750, 766.)

Defendant here cannot show that, had counsel made a section 352 objection, the trial court would have sustained it. Based upon the record before us, had the objection been made and overruled, any appellate challenge to such a hypothetical ruling would have failed, because of the absence of a showing that the court's exercise of discretion was conducted in an " 'arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues*, *supra*, 8 Cal.4th at pp. 1124-1125.)

But even if defendant were able to overcome this first hurdle—by having us assume that the trial court would have sustained a section 352 objection had trial counsel made it—he cannot show prejudice, i.e., that it is reasonably probable that he would have received a more favorable outcome as a result of the exclusion of the evidence. (*People v. Lewis*, *supra*, 50 Cal.3d at p. 288.) Defendant emphasizes that the only evidence supporting the convictions was the testimony of the victim, and therefore the case turned on J.D.'s credibility and reliability. The fact that the convictions were based to a large extent upon the victim himself is unremarkable in child sex abuse cases.

Defendant also highlights inconsistencies and uncertainties in the victim's testimony, but this also is not unusual in child sex abuse cases. Notwithstanding defendant's assertions, we do not view the evidence as a whole as displaying a weak or a close case in which defendant's fate may have rested on the admission or exclusion of the challenged evidence concerning the victim. The evidence of J.D.'s seizures and his move to San Diego was mild and constituted a minimal amount of the evidence presented by the prosecution. It was not emphasized by the prosecution; indeed, the prosecution did

not mention J.D.'s seizures during argument.[15]  Given the nature of the evidence and the fact that it only concerned the victim (but not defendant) and was not inflammatory to any degree, we conclude that it is not reasonably probable that defendant would have achieved a more favorable outcome in his trial had J.D.'s seizures and his move to San Diego been excluded.  Likewise, even assuming counsel's deficient performance, it was not of such a character or degree "that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.]" (*People v. Kipp*, *supra*, 18 Cal.4th at p. 366.)[16]

We therefore reject defendant's claim that trial counsel was prejudicially ineffective in failing to assert a section 352 objection to the evidence concerning the victim's seizures and his move to San Diego.

---

[15] There was, however, a very brief reference in closing argument that J.D. "came from San Diego.  He tried to escape this.  His family took him away."  But there was no mention of seizures.

[16] In his opening brief, defendant argues in passing that the standard for determining whether there was prejudice relative to the admission of the challenged evidence is the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24), namely, that the error must have been harmless beyond a reasonable doubt.  Elsewhere in his opening brief, he enunciates that the *Watson* (*People v. Watson* (1956) 46 Cal.2d 818, 836.) test is the appropriate standard, i.e., whether it is reasonably probable that defendant would have achieved a more favorable result if the evidence had been excluded.  He does not reiterate in his reply brief the assertion that the *Chapman* standard applies, instead arguing that "it is reasonably probable that [the challenged] evidence may have prompted the jury to convict [defendant] of all four counts in order to compensate the alleged victim and his family for their suffering."  The *Watson* "reasonably probable" standard of prejudice is applicable to evaluate claimed error in the admission of evidence (*People v. Malone* (1988) 47 Cal.3d 1, 23; *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018-1019), and a claim of prejudicially ineffective assistance of counsel (*People v. Lewis*, *supra*, 50 Cal.3d at p. 288).  We therefore reject any claim by defendant that the *Chapman* standard applies here.

DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Grover, J.

22